OPINION
{¶ 1} Defendant-appellant, Shadeed Barnett, appeals his conviction for felonious assault with a firearm specification following a jury trial in the Butler County Court of Common Pleas.
 {¶ 2} Appellant was indicted in November 2007 on one count of felonious *Page 2 
assault with two firearm specifications (brandishing a firearm and possessing an automatic firearm) for his role in a shootout that occurred in a Middletown, Ohio housing complex ("the projects," as referred to in the testimony of several witnesses) near Main and Lafayette Streets. The state alleged that in the early morning hours of September 19, 2007, appellant, along with Gabriel Tyrone Smith, Teray D. Marshall, Jr., and Terry Fuller, opened fire in the projects, riddling the neighborhood with bullets and injuring several people, including Demarco Conley (shot in the stomach), Jeremy McGuire (shot in the hand), Jerrel Wright, and Deontae Robinson (both shot in the leg). Demarco underwent numerous surgeries for his gunshot wound to the stomach and was still hospitalized at the time of the trial.
 {¶ 3} On February 11-15, 2008, appellant was jointly tried with Gabriel Tyrone Smith, Teray D. Marshall, Jr., and Terry Fuller. Appellant did not testify or present evidence on his behalf. Due to his serious, life-threatening injuries, Demarco was unable to physically testify at trial; a videotaped deposition of his testimony was instead played to the jury. Testimony at trial revealed the following facts:
 {¶ 4} In the early morning hours of September 19, 2007, Demarco was at a bar with his girlfriend, Lori Glover, and his best friend, Jeremy McGuire. According to Demarco, present at the bar were Teray D. Marshall, Jr., Gabriel Tyrone Smith ("Tyrone"), and Terry Fuller. Demarco did not remember seeing appellant at the bar. Lori and Jeremy saw Tyrone and Terry at the bar but did not see appellant or Teray (or were not sure if they were there). Terry was wearing orange. While at the bar, Demarco got into a fight with Brandon Smiley, a friend of Teray. After the fight, Lori drove to the projects with Demarco and Jeremy and dropped them off. It was *Page 3 
Demarco's intention to recruit friends to go finish the fight with Brandon.
 {¶ 5} An aerial view of the projects shows that it is comprised of three parallel streets: Cribbs Street to the north, Weaver Street to the south, and McGuire Street between the two; running perpendicular to these streets are Main Street to the east, and Vance Street to the west. Of importance to the case is a grassy area that is a joint backyard for apartment buildings on McGuire and Weaver Streets.
 {¶ 6} At the projects, Demarco and Jeremy met up with Demetrius Davis (Lori's brother), James Wilson, Jerrel Wright (Demarco's cousin), and Zeph Jennings. Demetrius and Zeph lived on Weaver Street, Jerrel on McGuire Street. As the group was getting together, Demetrius, James, Jeremy, and Zeph noticed a blue Ford Taurus with dark tinted windows on Weaver Street driving around the projects. Jeremy and Zeph did not see who was driving the Taurus. By contrast, Demetrius and James both testified that Tyrone was driving the Taurus. James further testified that his sister, Cierra Wilson, was a passenger in the Taurus. Cierra testified Tyrone was driving the Taurus in which she was a passenger.
 {¶ 7} After dropping off Demarco and Jeremy, and as she was driving south on Main Street, Lori noticed that Tyrone was following her in a blue Taurus. Lori eventually pulled over and the two briefly conversed from their cars. Lori did not see anybody else in the Taurus. During their conversation, Tyrone received a phone call. Tyrone told the caller "that's all you got to say. I'm on my way," then left and drove away towards the projects. Lori does not know who the caller was.
 {¶ 8} Meanwhile, in the projects, Demarco and his friends were on McGuire Street where they ran into D'Angela (James' cousin) who was crying because her *Page 4 
boyfriend, Deontae Robinson, had beaten her up. Upon seeing Deontae walking down the street, James, along with Jeremy and Demarco, beat up Deontae. Either during the beating or immediately after, Demetrius observed a silver Nissan vehicle drive on McGuire Street before turning on to Vance Street.[1] In the Nissan vehicle were appellant, Teray, and a third person wearing an orange shirt. Appellant was driving the car; Teray was in the front passenger seat. Appellant was wearing black; Teray did not have a hat or a jacket.
 {¶ 9} Soon after, gunfire erupted. Demetrius testified that Teray came around the corner from Vance Street and started shooting while walking down McGuire Street. James testified that Teray came around the corner from Vance Street with two other persons, stated: "I see you all bitch ass n***s," and started shooting. James could not tell who the other two persons were. By the look or the way it was shooting rapidly, Demetrius and James believed Teray was using an automatic weapon. Jerrel testified that the shooting started on McGuire Street near Vance Street; thereafter, it was coming from everywhere. By the sound of the gunfire, Jerrel believed automatic weapons were used. Before the shooting started, Zeph heard someone scream out of a car "I see you all n***s." Demarco heard someone yelling "there they go," followed by a "bunch" of automatic gunfire. Demarco did not know who started the gunfire, or where or why it started.
 {¶ 10} As gunfire erupted, Demarco and his friends scattered and took off running. Demetrius took off running towards Main Street with the intention to retreat into *Page 5 
the woods to the east of Main Street. He was in the grassy area between McGuire and Weaver Streets when he saw the Taurus come around; the front passenger window rolled down; shots were fired from the car. Demetrius retreated and hid behind a shed until he heard the Taurus leave. He then ran across Main Street to safety. Shooting was still going on after he had crossed Main Street. Demetrius observed the Taurus driving south on Main Street.
 {¶ 11} The record indicates Demetrius saw appellant twice during the shootout. Once was when Demetrius was hiding behind the shed: at that time, appellant was in the grassy area. Demetrius did not see appellant with a weapon. It is not clear from the trial transcript when Demetrius saw appellant the other time.
 {¶ 12} Zeph took off running through the grassy area towards Main Street. However, the Taurus came around and shots were fired from the car. Zeph retreated; as he was running away from Main Street, he saw Demarco. At that moment, someone in orange started shooting at Zeph who retreated to safety into a house.
 {¶ 13} Jeremy was shot in his right hand before he took off running. He does not know who shot him. After being shot, Jeremy took off running through the grassy area, ran across Main Street diagonally, and fell behind bushes.
 {¶ 14} Demarco took off running and hid behind a shed in the grassy area near Main Street. Gunfire and yelling continued. As he was hiding, he saw Jeremy, his best friend, being chased and fired at by two people. Demarco believed the two shooters were appellant and Teray. Jeremy was sprinting towards Main Street. Although the two shooters had already run past him, Demarco came out of hiding and yelled to distract them. The shooters turned towards him and started shooting. Demarco was shot in the *Page 6 
stomach in the grassy area near Main Street and fell to the ground. Someone then came to him and smacked him with a gun, stating "You're going to die bitch ass n***." Demarco recognized Teray's voice. Another individual with Teray told Teray "to come on because the police was coming." Demarco did not know if the second voice was appellant's voice. Demarco testified that at that point he was in and out of consciousness. This was confirmed by Officer Ken Minear who testified Demarco was unable to communicate as he was in and out of consciousness. Demarco testified that during the shootout "there was a lot of automatics going off; " more than two shooters were involved as there was too much gunfire to come solely from appellant and Teray.
 {¶ 15} Jerrel took off running through the grassy area when he saw his cousin Demarco fall. Jerrel started running towards Demarco when someone came around shooting. Jerrel retreated and was running back to his house when he was shot in the leg. Jerrel did not see who shot him and could not identify any of the shooters; all he "saw" were bullets.
 {¶ 16} James took off running as soon as Teray started shooting, and retreated to the grassy area where he ended up near Jerrel. At the beginning of the shootout, James also observed shots fired from the Taurus; at that time, the Taurus was on Main Street between McGuire and Weaver Streets. While he was in the grassy area, James observed Demarco get shot in that same grassy area near Main Street, fall to the ground, and being subsequently hit with a weapon by Teray who was accompanied by appellant. Appellant then told Teray: "Here come the police. Come on." Thereafter, Jerrel was shot by a shooter wearing an orange shirt. James was with him. After being shot, Jerrel pushed James into an apartment building. James does not know who shot *Page 7 
Demarco.
 {¶ 17} James further testified he saw appellant with a weapon; the weapon was bigger than a handgun; appellant and Teray were shooting when James was in the grassy area; and appellant was running towards Demarco and shooting when Demarco was shot.
 {¶ 18} Holly Cummings, a resident on McGuire Street, was playing cards that morning when she heard gunfire and people yelling. Looking out her back window into the grassy area, she observed a man with a big weapon walking through the grassy area towards Main Street. The man was wearing a hat and a jacket. The weapon was not a handgun. The man was not firing the weapon but was holding it up in sight.
 {¶ 19} Lori Griff is, a resident on Weaver Street, was awakened by the shootout. Looking out her front door, she observed a blue Ford Taurus with dark tinted windows on Weaver Street with the back passenger door open. The Taurus was facing the west. Griffis heard two men arguing somewhere in the area, with one saying "You're going to do me like that n***; " shots were then fired from the Taurus through the open door into the grassy area. The Taurus then drove "real fast" past her house to the end of the street, drove back to its original location in reverse, and finally drove back past her house and turned onto Vance Street. Griffis never saw anyone exit the Taurus. Griffis testified that when the Taurus drove in reverse, she could hear gunfire coming from the grassy area; in fact, a couple of bullets hit her storage shed located in the grassy area.
 {¶ 20} A police officer trained in weapons as a SWAT team member was on light duty that morning taking 911 calls. The officer testified that they received over 30 calls regarding the shootout and that while talking to callers, he could hear gunfire, both *Page 8 
automatic and semi-automatic.
 {¶ 21} At the scene, the police recovered 26 shell casings from three different calibers, to wit: seven 9 mm shell casings at the corner of Weaver and Main Streets; five .40 caliber shell casings in the grassy area near Vance Street; and 14 7.62x39 shell casings in the grassy area and at the corner of Weaver and Main Streets. The recovered shell casings all appeared to be "fresh" casings. No shell casings were found at the corner of Vance and McGuire Streets. Several bullet strikes and/or holes were found on the ground, telephone poles, and buildings, including inside a residence on McGuire Street. The crime scene covered three blocks. The weapons used in the shootout were never recovered.
 {¶ 22} The silver Nissan vehicle was recovered that day; it was parked on Vance Street and was rented to appellant. Although searched, nothing was recovered from the vehicle. The Taurus was found later that day on 17th Avenue. There was no damage to the body of the car or the windows. There were no shell casings in the car; "the interior was very clean." The Taurus was not processed for gun powder residue; a detective testified powder residue tests are no longer considered reliable. A bullet was found lodged inside the top of a rear passenger door of the Taurus. Detective David Swartzel testified the bullet appeared to have been fired from the Taurus (and not at the Taurus).
 {¶ 23} Teray and Tyrone turned themselves in. Appellant was arrested the day after the shootout. A search of his apartment yielded one .40 caliber bullet, two bullet proof vest carriers without their panels but each with a holster of a different size, and appellant's passport. Neither the holsters nor appellant were checked for gun powder *Page 9 
residue.
 {¶ 24} Chris Monturo of the Miami Valley Regional Crime Laboratory testified he examined the 26 shell casings recovered from the crime scene. According to Monturo, at least four weapons were involved in the shootout: three semi-automatic or automatic weapons and possibly one revolver. The .40 caliber shell casings all came from one gun; as did the 9 mm shell casings. Monturo testified a TEC-9 weapon uses 9 mm bullets, is typically a semi-automatic weapon, but can be converted into an automatic weapon. With regard to the 7.62x39 shell casings, Monturo testified two types of semiautomatic weapons can use those shells: AK-47 and SKS weapons; both weapons can be converted into automatic weapons; however, he could not tell whether the shell casings came from the same weapon. Monturo also could not tell whether the weapons used were semi-automatic or automatic weapons.
 {¶ 25} Monturo further testified that a bullet recovered from inside a residence on McGuire Street was fired from an AK-47, AKS, or SKS semi-automatic weapon; a bullet recovered in the grassy area was fired from a Beretta Smith-Wesson or a Springfield XD semi-automatic pistol; and the bullet recovered in the Taurus was fired from a revolver.
 {¶ 26} Following Monturo's testimony and over appellant's objection, the trial court admitted a photograph of appellant showing him wearing a weapon in a holster. Middletown Detective Larry Fultz testified that on the photograph, appellant was "wearing a shoulder-type holster with what appears to be a Tech 9 [sic] with an extended magazine." The detective testified that the photograph was recovered during a search warrant "several years back; " the search warrant was not directed at appellant; he did not know when or where the photograph was taken, who took it, and whether it *Page 10 
was taken at a Halloween or costume party; he did not know how old appellant was on the photograph; and he did not know if the weapon displayed on the photograph was a real weapon or an airsoft gun.
 {¶ 27} On February 15, 2008, the jury found appellant guilty of felonious assault with one firearm specification (brandishing a firearm). Appellant was subsequently sentenced to 11 years in prison. He now appeals, raising three assignments of error.
 {¶ 28} Assignment of Error No. 1:
 {¶ 29} "THE TRIAL COURT ERRED BY PERMITTING THE STATE TO USE THE VIDEOTAPED DEPOSITION OF DEMARCO CONLEY INSTEAD OF REQUIRING HIM TO TESTIFY IN PERSON BEFORE THE JURY."
 {¶ 30} Appellant argues the state failed to show Demarco was unavailable to testify at trial, therefore the trial court abused its discretion in admitting Demarco's videotaped deposition instead of requiring him to testify in person. Appellant asserts, without explaining how or why, that the use of the videotaped deposition "rendered the trial fundamentally unfair and greatly prejudiced [appellant]."
 {¶ 31} Due to Demarco's serious injuries, his testimony was videotaped on December 5, 2007 (two months before the trial) and preserved for trial pursuant to Crim. R. 15. The state moved to use Demarco's deposition at trial in lieu of his live testimony. The motion was supported by an affidavit from Demarco's physician dated January 31, 2008. The affidavit stated that (1) due to the gunshot wound, Demarco's "current condition [was] serious and he still suffered] from life-threatening injuries; " (2) based on the serious nature of his injuries, "the ongoing complications as a result of his injuries," and the "risk of aggravating the injuries due to the potential physical and *Page 11 
mental stress," the physician advised against transporting Demarco to court for his live testimony as "any transport could jeopardize his condition; " and (3) it was the physician's "opinion, to a reasonable degree of medical certainty, that Demarco [] will be unable to be present to testify at this trial."
 {¶ 32} Five days before trial, a hearing was held regarding the deposition. The state represented that Demarco was suffering from liver failure, his condition was worsening, and as a result, he was going to be transported to a hospital in Pennsylvania within a week. All four defense attorneys objected to the use of the videotaped deposition at trial on the ground it would violate their clients' Sixth Amendment right to confrontation. Appellant's attorney further argued that if Demarco was well enough to be transported to Pennsylvania, he was well enough to be transported to the trial court to testify in person.
 {¶ 33} The trial court accepted the state's representation that Demarco was unable to testify at trial because he was too ill; noted that all four defense attorneys were present during Demarco's deposition; and noted that the videotaped deposition would allow the jury to measure Demarco's credibility. The trial court then allowed the use of the videotaped deposition at trial but told the state it would have to represent at trial that Demarco was an unavailable witness. At trial, following Zeph's testimony, the state requested permission to play the videotaped deposition to the jury, stating: "Your Honor, with the finding of unavailability, we would play [the videotaped deposition], your Honor." The trial court told the jury to give Demarco "the same weight you would give [him] if [Demarco] was here testifying in person." The videotaped deposition was then played to the jury. *Page 12 
 {¶ 34} Crim. R. 15 provides for the taking of depositions for use in a criminal trial if a witness cannot attend the trial. Under Crim. R. 15(F), a witness' deposition may be used at trial if "the witness is unable to attend or testify because of sickness or infirmity." Evid. R. 804(B)(1) creates an hearsay exception for testimony given in a deposition by an unavailable declarant if the statement was made while the declarant was testifying as a witness in a proceeding, and if the party against whom the testimony is now offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Under Evid. R. 804(A)(4), a declarant is unavailable if he is unable to be present or testify because of "then-existing physical or mental illness or infirmity." The use of a witness' videotaped deposition at trial does not violate a defendant's right to confrontation if the defendant was present during the deposition and able to cross-examine the witness. See State v. Phillips,74 Ohio St.3d 72, 95, 1995-Ohio-171, certiorari denied (1996), 517 U.S. 1213,116 S.Ct. 1835.
 {¶ 35} Appellant challenges the use of Demarco's videotaped deposition at trial on the ground that the state failed to prove at trial that Demarco was an unavailable witness.
 {¶ 36} We note that appellant did not object to the use of the deposition during trial and specifically did not object when, before it played the deposition, the state stated: "Your Honor, with the findingof unavailability, we would play [the videotaped deposition], your Honor."[2] (Emphasis added.) As such, the issue is waived absent a showing of plain error. See Phillips at 95; Crim. R. 52(B). Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances, *Page 13 
and only to prevent a manifest miscarriage of justice. State v.Palmer, Warren App. No. CA2005-08-097, 2006-Ohio-2712, ¶ 6; State v.Long (1978), 53 Ohio St.2d 91. We find no plain error.
 {¶ 37} We fail to see how the use of Demarco's videotaped deposition "rendered the trial fundamentally unfair and greatly prejudiced [appellant]." Appellant, along with Teray, Tyrone, and Terry, was physically present at Demarco's videotaped deposition. Likewise, all four defense attorneys, and thus appellant's attorney, were physically present at Demarco's deposition; all four attorneys cross-examined Demarco following the state's direct examination. Although it was played during trial, the trial court did not allow the jury to have the videotaped deposition during their deliberations.
 {¶ 38} We therefore find that the trial court did not abuse its discretion in admitting Demarco's videotaped deposition instead of requiring him to testify in person. See State v. Ervin, Cuyahoga App. No. 80473, 2002-Ohio-4093 (use at trial of the videotaped deposition of a witness unable to testify in person due to a scheduled surgery at the time of the trial did not violate right to confrontation where defendant was present during the entire deposition and witness was cross-examined); State v. Irwin, Mahoning App. No. 06 MA 20,2007-Ohio-4996 (no error in allowing the deposition of the victim to be entered into evidence; victim was dying from Lou Gehrig's disease at the time of the deposition and died prior to trial).
 {¶ 39} Appellant's first assignment of error is overruled.
 {¶ 40} Assignment of Error No. 2:
 {¶ 41} "THE TRIAL COURT ERRED IN ADMITTING A PHOTOGRAPH OF [APPELLANT] IN VIOLATION OF EVIDENCE RULE 403(A)." *Page 14 
 {¶ 42} Appellant challenges the admission into evidence and over his objection of a photograph showing him wearing a shoulder-type holster with what appeared to be a TEC-9 weapon. Appellant asserts that the photograph "unfairly associates [him] with gang-violence and gang-shootings," and that any minimal probative value of the photograph was substantially outweighed by its unfairly prejudicial effect in violation of Evid. R. 403(A).
 {¶ 43} A trial court has broad discretion in determining the admissibility of evidence at trial, and unless the trial court has abused its discretion and the defendant has been materially prejudiced thereby, an appellate court may not reverse. State v. Hymore (1967),9 Ohio St.2d 122, 128, certiorari denied (1968), 390 U.S. 1024,88 S.Ct. 1409; State v. Maurer (1984), 15 Ohio St.3d 239, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714 (under Evid. R. 403, admission of photographs into evidence is within the sound discretion of the trial court). An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 129-130.
 {¶ 44} Evid. R. 403(A) provides that "[although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Under Evid. R. 403(A), only evidence that is unfairly prejudicial is excludable. See State v. Crotts,104 Ohio St.3d 432, 2004-Ohio-6550. As the Ohio Supreme Court stated, "Evid. R. 403 speaks in terms of unfair prejudice. Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid. R. 403 prohibits." State v. Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 107. *Page 15 
 {¶ 45} Although prejudicial to the interest of appellant, the photograph is neither unfair nor does it confuse the issues or mislead the jury. Before the photograph was admitted, there was testimony that a TEC-9 weapon uses 9 mm bullets, is typically a semi-automatic weapon, but can be converted into an automatic weapon. 9 mm shell casings were recovered at the scene. The photograph was relevant and probative to the state's case in attempting to prove the automatic firearm specification in the indictment. See State v. Porch (May 5, 1994), Cuyahoga App. No. 65348. The jury ultimately found appellant not guilty of the automatic firearm specification.
 {¶ 46} Before admitting the photograph, the trial court conducted a hearing outside the presence of the jury during which the testimony of Detective Fultz was proffered. The trial court noted that "all evidence is prejudicial to some effect, but in this particular case, certainly it is subject to cross-examination with the detective." The court then admonished the state not to "get into any kind of gang activities," and admitted the photograph.
 {¶ 47} Thereafter, the detective testified that on the photograph, appellant was "wearing a shoulder-type holster with what appears to be a Tech 9 [sic] with an extended magazine; " the photograph was recovered during a search warrant "several years back; " the search warrant was not directed at appellant; the detective did not know when or where the photograph was taken, who took it, and whether it was taken at a Halloween or costume party; he did not know how old appellant was on the photograph; and he did not know if the weapon displayed on the photograph was a real weapon or an airsoft gun. There was no testimony linking the photograph or appellant to gang-violence, gang-shootings, or gang activities. *Page 16 
 {¶ 48} We find that the photograph did not unfairly prejudice appellant. Accordingly, we find no abuse of discretion in the trial court's decision admitting the photograph of appellant with a weapon. Appellant's second assignment of error is overruled.
 {¶ 49} Assignment of Error No. 3:
 {¶ 50} "THE JURY VERDICT IS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 {¶ 51} Appellant argues that in light of the fact there was no direct testimony he shot and wounded Demarco; Demarco was not sure if he was shot by appellant; and James, a friend of Demarco, admitted he would lie for Demarco, appellant's jury conviction for felonious assault was not supported by sufficient evidence.
 {¶ 52} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"State v. McKnight, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 70, quotingState v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus. A reviewing court must not substitute its evaluation of the witnesses' credibility for that of the jury's. See State v. Holdbrook, Butler App. No. CA2005-11-482, 2006-Ohio-5841.
 {¶ 53} Further, circumstantial evidence and direct evidence have the same probative value; in some instances, certain facts can only be established by circumstantial evidence. State v. Mobus, Butler App. No. CA2005-01-004, 2005-Ohio-6164, ¶ 51, citing Jenks at 272. A conviction based on circumstantial evidence is no less sound than one based on direct evidence. Mobus at ¶ 51. *Page 17 
 {¶ 54} Appellant was convicted of felonious assault, in violation of R.C. 2903.11(A)(2), which states: "No person shall knowingly * * * cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." The jury further found appellant "did have, or aided or abetted another who had a firearm on or about his person or control and either displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm or used it to facilitate the offense." See R.C. 2941.145(A).
 {¶ 55} In the early morning hours of September 19, 2007, Demarco was involved in a fight at the bar with a friend of Teray. After the fight, Demarco drove to the projects to recruit friends to go finish the bar fight. At the project, either during or after the beating of Deontae, Demetrius observed a silver Nissan vehicle driven by appellant drive on McGuire Street before turning onto Vance Street. Teray was in the front passenger seat and was not wearing a hat or a jacket. The car was recovered later that day on Vance Street. It was rented to appellant.
 {¶ 56} Soon after the vehicle turned onto Vance Street, gunfire erupted: Demetrius and James saw Teray come around the corner from Vance Street and start shooting while walking down McGuire Street. According to James, Teray was with two other persons but he could not tell who these people were. Demetrius, James, and Jerrel believed automatic weapons were used. Upon hearing gunfire and people yelling, Holly Cummings, a resident on McGuire Street, looked out her back window into the grassy area and observed a man with a big weapon walking through the grassy area towards Main Street. The weapon was not a handgun. The man was holding it up in sight. The man was wearing a hat and a jacket. According to Demetrius, Teray was not *Page 18 
wearing a hat or a jacket.
 {¶ 57} Demarco was shot in the grassy area near Main Street and fell to the ground. After seeing Demarco being shot and falling to the ground, James observed Teray, who was with appellant, hit Demarco with a weapon. Appellant then told Teray: "Here come the police. Come on." Although James did not know who shot Demarco, he observed appellant and Teray each with a weapon. Appellant's weapon was bigger than a handgun and was shooting rapidly. According to James, (1) both appellant and Teray were shooting when James was in the grassy area, and (2) appellant was running towards Demarco and shooting when the latter was shot. Demetrius testified he was friends with Demarco; his sister, Lori, was Demarco's girlfriend. James, a friend of Demarco, testified he would lie for Demarco but had no reason to lie in the case at bar.
 {¶ 58} On direct examination, Demarco testified that while hiding behind a shed, he saw appellant and Teray chase Jeremy. Demarco yelled; appellant and Teray turned towards him and started shooting; Demarco "got hit; " he was in the grassy area near Main Street. Someone then came to him and smacked him with a gun, stating "You're going to die bitch ass n***." Demarco recognized Teray's voice. Another individual with Teray told Teray "to come on because the police was coming." Demarco did not know if the second voice was appellant's voice. Demarco testified that at that point he was in and out of consciousness.
 {¶ 59} On cross-examination, Demarco testified he believed appellant and Teray were the two shooters chasing Jeremy but could not be positive; he did not know if he was shot by appellant, Teray, or both; he was hit once and the bullet was still in his body; and he was not sure who the person who came to him was. Demarco also *Page 19 
testified appellant and Teray both had weapons when they were chasing Jeremy.
 {¶ 60} At the scene, 9 mm and .40 caliber shell casings were recovered. After appellant was arrested, a search of his apartment yielded one .40 caliber bullet and two bullet proof vest carriers without their panels but each with a holster of a different size. A photograph showed appellant wearing a shoulder-type holster with what appeared to be a TEC-9 weapon. Monturo testified a TEC-9 weapon uses 9 mm bullets.
 {¶ 61} While much of the evidence against appellant is circumstantial, viewing this evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that the elements of the felonious assault offense were proved beyond a reasonable doubt. Accordingly, we find sufficient evidence to support appellant's conviction for felonious assault with a firearm specification.
 {¶ 62} Appellant's third assignment of error is overruled.
 {¶ 63} Judgment affirmed.
BRESSLER, P.J., and POWELL, J., concur.
[1] Demetrius testified observing a silver Nissan "Altima." However, the silver Nissan vehicle recovered after the shootout was a silver Nissan Maxima and was rented to appellant. The license plate number on the recovered vehicle was identical to the license plate number on the rental agreement signed by appellant. Nissan Altimas and Nissan Maximas are similar in appearance.
[2] The other three defense attorneys likewise did not object to the state's "finding of unavailability" statement. *Page 1